# Richmond

## LEE HICKS v. COMMONWEALTH OF VIRGINIA.

January 14, 1932.

Present, Campbell, C. J., and Epes, Hudgins and Browning, JJ.

The opinion states the case.

*Charles Henry Smith* and *E. Joel Treger*, for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

BROWNING, J., delivered the opinion of the court.

On March 26, 1931, the defendant was indicted and tried in the Circuit Court of Fairfax county, Virginia, upon the charge of grand larceny. The indictment alleged the stealing of a certain Chevrolet automobile motor or engine, of a specific number, of the value of $200.00, and certain transmission from a 1927 model, Chevrolet sedan, of the

value of $75.00, being the property of one H. B. Pyle. He was convicted and sentenced, in accordance with the jury's verdict, to serve two years in the State penitentiary. This court allowed him a writ of error, and hence the case is before us.

The facts as shown by the evidence are these: On the 10th of May, 1930, a man named H. B. Pyle, a merchant and resident of Belair, Maryland, loaned his Chevrolet sedan automobile to his son-in-law, Mr. W. L. Finney, who drove it into Baltimore to see his wife, who was a patient at the Johns Hopkins Hospital. Finney parked the car on the street in front of the hospital and when he returned it was missing. The loss was at once reported to the police and about the 19th of July, 1930, the owner was notified that his automobile had been located in Fairfax county, Virginia, at a place known as Accotink. The car was purchased by Mr. Pyle in 1927, for $820.00. It had been driven, at the time it was stolen, 5,800 miles and it had recently been put in excellent mechanical condition, and the owner had been offered $400.00 for it in a trade.

An investigation made by an officer of the police department of the Virginia State Division of Motor Vehicles, in conjunction with a prohibition inspector, resulted in the discovery by them, in the woods adjacent to the house of the accused, but some distance from it, a still, and an automobile track leading from this still further down through the woods. They followed this track and came upon a light automobile truck which had been driven as far in the woods as it could be gotten. The key had been taken out but the officers, one of whom had seen the accused driving this truck before, got the truck started and drove it out on a county road where they met accused, driving with his wife, in a Pontiac sedan. The accused was stopped and told by the officers that they had found this truck in the woods and that they had also found a still. Accused was asked

if the truck belonged to him, to which he replied that it did not and that he knew nothing about it. However, before going into the woods, one of the said officers, E. J. McDermott, of the Motor Vehicle Department, procured a search warrant and went to the home of the accused who was not there at the time. He searched the premises and found some of the parts of a Chevrolet car, consisting of parts of the transmission, door latches and handles, some of the gear shift and some upholstery. Some of the same kind of upholstery was found in the truck which was driven out of the woods. It had been put on the seat. The number of the motor in the truck had been effaced or as one of the witnesses stated, it had been filed or ground off, but the serial number was the same that had been furnished the officer in the report of the missing or stolen Chevrolet sedan belonging to Pyle. A man named Fairchild, who was employed by the Automobile Underwriters' Association, was procured who processed the effaced motor number, bringing it out so that it was distinctly legible, and the number was the same as that which had been reported to the officer as being the motor number of the Pyle sedan. Mr. Pyle came to Virginia and exhibited his certificate of title which showed the same serial and motor numbers as appeared on the motor in question. Accused was arrested and taken before an examining magistrate where, according to the testimony of three witnesses, he again denied the ownership of the truck in which the motor was and said that he did not know whose it was.

Upon his trial the accused said that he had admitted the ownership of the truck before the magistrate and that his reason for denying it when he was first accosted by the officers was that they told him that they had also discovered a still, and that as he had loaned the truck to one Irving Shepherd and did not know what he had been doing with it, he was afraid that he might become involved in a charge connecting him with the still.

The account which the accused gave of his possession of the motor was that a man named Howard had informed him that an old car was down in the woods, and that they went there and found that it had been taken apart and the parts were scattered over the ground, and that he and Howard, who was his brother-in-law, first considered making use of the motor for Howard's boat, but later he concluded to use it in his truck as he was having trouble with the motor already in it; that he had a mechanic come to the scene from Alexandria and recondition the abandoned motor by putting a new head in it, and then it was put in his truck and the mechanic returned to Alexandria with accused's disabled motor.

Howard corroborated the accused as to the car being dismantled in the woods and the suggestion that the motor might be used in his boat, and further stated that Walter Dodson had told him about the presence of the car. There was other testimony to the effect that Walter Dodson had seen the body of the car in the woods which he took to his home with the knowledge and consent of the magistrate, until the matter could be investigated. This circumstance, when learned of by the officers in the first instance, proved to be the clue which led to the whole discovery.

Stephen Harley also testified that he, in company with a man named Robert Hicks, saw where a car had been abandoned in the woods.

The fact that persons happened to see the conditions in the woods as they obtained, we do not regard as of much value. The significant inquiry is how did the car get there and who dismantled it. The accused was found with numerous small parts of a similar car in his possession at his home. He was found with the motor in his truck which he said he had been using for three weeks. He denied ownership of the truck and swore falsely concerning it. He disclaimed any knowledge of the things that appeared to point

unerringly to his guilt. He stated that he bought a new head for the motor from the mechanic. An examination of the motor by a representative of the State Motor Vehicle Department, in the presence of the jury, disclosed the truth to be that the serial number of the motor and the head were the same.

The ownership of the truck was not divulged by the accused until the Commonwealth proved that the license was issued in his name.

▪ ██ ██ It was in the interest of some one to destroy the identity of that car. The accused was found with the motor with its number obliterated. He gave false accounts of material facts connected with it.

It was for the jury to determine his guilt or innocence. It has done so and we cannot disturb its finding unless it is plainly wrong or there is some error of law on the part of the trial court's rulings. The former we cannot say and as to the latter the accused has submitted a number of assignments. He contends that there is no evidence as to the value of the alleged stolen articles. Pyle and Finney both testified as to their value, one that the motor was worth $200.00 and the other $150.00. The purchase price of the car was in evidence. The number of miles it had been run was shown. Its trade-in value was known, and the relative importance of the motor to other parts of a car bear upon its value and are evidential. The witness Finney had had experience in appraising automobiles which it seems would properly involve a consideration of the value of the parts as well as the whole.

We think the matter elicited was within the range of men of ordinary knowledge and observation, and that the witnesses were competent, and that therefore there was no error in the ruling of the court in admitting their testimony.

Again, it is contended in varying forms of objection that the court should have set aside the verdict as contrary to

the law and the evidence. What we have already said is confirmatory of our opinion that it was a matter for the jury under proper instructions from the court.

The court declined to grant the request of the accused to give the following instruction: "Property rights in an abandoned article cannot be asserted by any one person over the other, and if the facts and circumstances in this case justified the defendant in believing that the car in question was abandoned at the time he found it in the woods, then you must find him not guilty."

The facts and circumstances of this case, in our opinion, would not have justified the instruction in the form prayed for. At any rate, instruction "C" given by the court covered the point and was much more appropriate. This instruction was as follows: "If you believe from the evidence that the defendant thought that the car in question was an abandoned car, and that he took the motor and other parts believing that the owner or owners of the same had abandoned it either because of a wreck or any other cause, and had no intention of depriving the lawful owner of the same, you must find the defendant not guilty." Certainly this instruction was as liberal and favorable to the accused as the facts and the circumstances justified.

Instruction number 4, which was given, dealing with the presumption of guilt from the exclusive and unexplained possession of recently stolen goods, and such possession making it incumbent upon the accused possessor to account for such possession consistently with his innocence, is also the subject of exception.

The principle of this instruction was sanctioned by this court in the case of *Jolly* v. *Commonwealth*, 136 Va. 756, 765, 118 S. E. 109, 112, Judge Kelly delivering the opinion. It was there said: "Exception was taken and error is assigned because the court instructed the jury as follows: 'The court instructs the jury that the possession of recently

stolen property creates a presumption of guilt of the larceny of the property, and places upon the accused the burden of explaining such possession'." Continuing the court says: "It would have been better if the court had given, in lieu of the above, an instruction substantially as follows: 'The court instructs the jury that the possession of recently stolen goods usually creates a presumption of guilt of the larceny of the property, and is a circumstance from which the jury may presume guilt, unless it appears from the evidence that the possession was consistent with the innocence of the accused.' See *Stewart & Myers* v. *Com.*, 132 Va. 746, 111 S. E. 463. The instruction as actually given, however, embodied a correct principle. *Porterfield's Case*, 91 Va. 801, 805, 22 S. E. 352. If the accused had possession of the stolen property, it was necessary for him to explain such possession, unless the circumstances were such that his silence could be regarded as consistent with his innocence."

The instruction which was given in the case at bar and which was the subject of the exception we have been discussing is as follows: "The court instructs the jury that if they believe from the evidence beyond a reasonable doubt that the property set forth in the indictment belonged to the prosecuting witness, and that said property or any part thereof was stolen and was thereafter found in the exclusive and unexplained possession of the prisoner, then such possession of itself affords sufficient ground for the presumption that the accused was the thief and makes it incumbent upon him to account for such possession consistently with his innocence." We are not in accord with the contention that the granting of this instruction constituted error. The element of reasonable doubt as to any fact essential to his conviction entitling him to acquittal and the presumption of innocence was stressed in another instruction.

We think there was no error in permitting the accused, as a witness, to be asked on cross-examination how many times he had been convicted of manufacturing liquor. His answer, over objection to the question, was that he had been convicted twice. In taking the witness stand he avouched his own credibility. The question only went to his credibility. It did not otherwise affect the question of his guilt or innocence of the crime charged. We think it was legitimate for the purpose intended. The Virginia statute has made the manufacture of liquor a felony, and section 4779 provides that the fact of conviction of a felony may be shown in evidence to affect the credit of a witness.

Counsel for the accused raises in this court, for the first time, the question of venue. Rule 22 of this court and the decided cases on this point settle the question adversely to him. He cannot be heard to raise it initially here. See *Harris* v. *Shield's Ex'r*, 111 Va. 643, 69 S. E. 933; *Com.* v. *Carter*, 126 Va. 475, 102 S. E. 60; *Com.* v. *Columbian Paper Co.*, 143 Va. 332, 130 S. E. 421.

The judgment of the trial court will be affirmed.

*Affirmed.*